**CHRYSLER CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**Ted L. VANZANT, an Individual, d/b/a/ Country Craft, Defendant.**

**No. ED CV 94–0049 RT (CTx).**

United States District Court, C.D. California.

April 6, 1999.

---

David W. Quinto, Quinn Emanuel Urquhart Oliver and Hedges, L.L.P., Los Angeles, California, Richard P. Vitek, Harness, Dickey & Pierce, P.L.C., Troy, Michigan, for plaintiff/counter-defendant.

Ted L. Vanzant, Norco, California, in pro per.

**PROCEEDINGS: ORDER (1) GRANTING VANZANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II OF CHRYSLER'S COMPLAINT, AND ON THAT PORTION OF COUNT III WHICH STATES A CLAIM FOR STATE UNFAIR COMPETITION; AND (2) DENYING CHRYSLER'S MOTION FOR SUMMARY ADJUDICATION OF THE ISSUE OF ITS GRILLE DESIGN'S NON–FUNCTIONALITY.**

TIMLIN, District Judge.

Currently before the Court are two motions for summary judgment, one filed by plaintiff and one filed by defendant. The Court has read and considered plaintiff and defendant's moving papers, defendant and plaintiff's opposition, and plaintiff and

defendant's reply papers. Based on such consideration, the Court concludes as follows:

## I.

## BACKGROUND

Since 1992, plaintiff Chrysler Corporation ("Chrysler") and defendant Ted L. Vanzant ("Vanzant") have been embroiled in this litigation. The primary basis of this litigation is Chrysler's assertion that Vanzant has infringed its trademark rights in a Jeep grille design by manufacturing and selling form-fitting grille screens and overlays that mimic the grille design.

Chrysler originally filed its complaint against Vanzant in the United States District Court for the Eastern Division of Michigan on September 4, 1992. Vanzant, however, successfully moved that court to dismiss Chrysler's suit for improper venue. On January 15, 1993, Chrysler re-filed its complaint in the Southern Division of the United States District Court for the Central District of California from which the case was later transferred to the Central District's Eastern Division. The complaint sets forth claims for (1) infringement of a registered mark in violation of the Lanham Act, 15 U.S.C. § 1114(1) ("Count 1"); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) ("Count II"); and (3) unfair competition and trademark dilution in violation of California law ("Count III").

While the case was in the Southern Division, Chrysler filed a motion for summary judgment on its infringement and dilution claims which the court granted on June 28, 1993. Vanzant appealed, and in an unpublished opinion, the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") reversed.

The Ninth Circuit held that Chrysler was not entitled to summary judgment on the evidence submitted in support of its motion. Specifically, the court concluded that Chrysler's trademark registration in the Jeep grille design affords it no presumption of trademark protectability in this case because the registrations only cover use of the grille design on "land vehicles" whereas Vanzant is using the design to make grille screens and overlays. The court also stated that to succeed on its trademark infringement claims, Chrysler had to prove affirmatively under the "related goods rule" the protectability of its grille design in the grille screen and overlay market as well as infringement. Because Chrysler had submitted no evidence that would support the protectability of its grille design in the grille screen and overlay market besides its trademark registrations, the court held that Chrysler was not entitled to summary judgment. It therefore reversed the district court's order granting Chrysler summary judgment.

Vanzant now seeks summary judgment on Counts I and II and a portion of Count III of Chrysler's complaint. He contends that Chrysler cannot meet its burden of proving that the Jeep grille design had attained secondary meaning in the grille screen and overlay market prior to January 15, 1990, the date by which he began selling his screens and overlays. Chrysler contests this assertion.

Chrysler also has moved this Court for summary adjudication of the issue of its grille design's non-functionality. Chrysler contends that because there are at least two other ways to build grille screens for Jeeps, its grille design is non-functional as a matter of law when used to manufacture grille screens or overlays. Vanzant disputes this contention.

## II.

## UNDISPUTED MATERIAL FACTS

Chrysler is a manufacture of automobiles and automobile accessories. One of these automobiles is the Jeep sports utility vehicle ("Jeep"). Chrysler and its predecessors in interest (collectively, "Chrysler") have manufactured and sold Jeeps for more than 30 years. During that time,

Chrysler registered as trademarks at least two Jeep grille designs for use on "land vehicles" (i.e., automobiles). Chrysler registered the first mark, numbered 1, 170,-088, (the "088 mark") in 1981. Chrysler registered the second mark, numbered 1,433,760, (the "760 mark") in 1987. The 760 mark attained incontestability status in 1992, and Chrysler has sold hundreds of thousands of Jeep vehicles incorporating the 760 mark since 1986.

The two grille designs are similar in appearance. Both are flat pieces of metal, substantially trapezoidal, with holes left open for a pair of headlights and a smaller pair of fog lights, situated below the headlights. The grille's longer top and shorter bottom edges run parallel to each other, while the right and left edges angle inward from top to bottom. Between the openings left for the two pairs of lights are seven (roughly) identical openings in the grille which allow air to reach the Jeep's radiator. These seven openings are elliptical on the 088 grille design and rectangular on the 760 grille design, and run nearly the length of the grille vertically. On the earlier grille design (i.e., the 088 mark), all of the openings, as well as the overall grille design, are round or rounder, while on the later grille design (i.e., the 760 mark), the openings are generally more rectangular as is the overall grille design.

Defendant Vanzant, appearing pro se, lives and does business in Norco, California. He manufactures and sells after-market automobile accessories under the name "Country Craft." Among these parts are several that are designed to fit Jeeps. One that he labels a "tube step" is a piece of metal tubing shaped to fit below the vehicle's door and to provide a step into the vehicle's passenger compartment. A second one that he labels an "entry shield" is designed to fit within a Jeep's door frame and to protect the vehicle's paint from wear that can accompany individuals' entry and exit from the vehicle.

Two other parts manufactured and sold by Vanzant for use on Jeeps are the subject matter of this dispute. The first is a grille "screen" and the second is a grille "overlay." Both products substantially mimic Chrysler's 760 mark and Vanzant, in fact, has admitted using a Jeep grille embodying the 760 mark to make his grille screens and overlays. The grille screens cover the entire Jeep grille fixture while also covering the seven ventilation slots with a wire mesh. They apparently come in several different colors. The grille overlays cover the entire Jeep grille fixture but without also covering the seven ventilation slots. The overlays come only in black but can be painted to match the vehicle or to provide the grille with a color different than that of the rest of the vehicle. Vanzant has sold these products since at least January 15, 1990. Chrysler has sold grille overlays identical to those of Vanzant since 1987 [1] and has entered into "numerous Consent Judgments and Agreements relating to its Jeep grille overlays and the enforcement of the Registered Trademark."

### III.

### ANALYSIS

### A. GENERAL PRINCIPLES OF LAW

#### 1. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a district court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

Supreme Court and Ninth Circuit precedent establish the following standards for consideration of such motions: "If the par-

---

1. It is unclear whether Chrysler also sells grille screens identical to those of Vanzant since it has submitted no evidence to that effect.

ty moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrates the absence of any genuine issue of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (quoting Fed. R.Civ.P. 56(e)) (emphasis added in court opinion) (citations omitted). With respect to these specific facts offered by the non-moving party, the court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the non-moving party. *See id.* at 630–31.

Rule 56(c) nevertheless requires this Court to enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party who does not bear the burden of proof at trial need not present any evidence to support its motion for summary judgment but may instead point out the other party's inability to support an essential element of its claim. *See id.* at 325, 106 S.Ct. at 2554.

In order to defeat a motion for summary judgment, a plaintiff who bears the burden of persuasion must present "significant probative evidence tending to support the complaint." *T.W. Elec. Serv.,* 809 F.2d at 630. "The mere existence of a scintilla of evidence in support of the non-moving party's position [is] insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d

202 (1986). This Court thus applies to either party's motion for summary judgment the same standard as for a motion for directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

**2. Chrysler's Burden Under the "Related Goods Rule"**

■ A party alleging trademark infringement must demonstrate that (1) it has a protectable trademark (i.e., "protectability") (2) which another party has infringed (i.e., "infringement"). *See Rachel v. Banana Republic,* 831 F.2d 1503, 1506 (9th Cir.1987) (citing *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 841 (9th Cir.1987). In all cases, infringement must be proven affirmatively. Infringement is shown where the owner of a trademark demonstrates that another party's use of the same, or of a similar, mark on goods is likely to confuse the public as to the trademark owner's manufacture, sponsorship, or endorsement of the goods on which the other party uses the allegedly infringing mark. *See Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 790 (9th Cir.1981). A party claiming trademark infringement, however, need not affirmatively prove the protectability of its trademark in all cases. Where the owner of the alleged trademark has registered the mark, such registration affords it a presumption of protectability in cases brought against someone who has used the mark *on goods covered by the registration. See* 15 U.S.C. § 1115(a) ("Any registration issued under the [Lanham] Act ... shall be prima facie evidence of the validity of the registered mark ... in connection with the goods or services specified in the registration...."). But in cases brought against someone who has used the mark on "related goods" not covered by the registration, the Ninth Cir-

cuit applies the "related goods rule." [2]

▮▮▮▮ Pursuant to this rule, the owner of a registered trademark can bring a section 1114 trademark infringement claim [3] against the maker of related goods bearing a mark identical or similar to that covered by the registration, *see, e.g., Charles Schwab,* 665 F.Supp. at 804 (noting that registered trademark may be infringed by use of mark on related goods), subject to a critical limitation: The party must prove affirmatively that the mark covered in the registration is protectable in the related goods market; it may not rely upon the statutory presumption of protectability. *See Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1354 (9th Cir.1985) (en banc) (*"Blue Bell II"*) (noting that trademark "registration constitutes prima facie evidence of a protected interest [in a trademark] with respect to the goods specified in the registration only"); *Schwab,* 665 F.Supp. at 804 n. 3 (noting that in a related goods case, a trademark plaintiff "cannot simply rely on federal registration alone to establish its cause of action"). For trade dress and product configuration cases, this requires the party alleging trademark infringement to prove that its mark is non-functional and possesses secondary meaning [4] in the related goods market. *See Banana Republic,* 831 F.2d at 1506.[5]

In the previous appeal in this case, the Ninth Circuit held that this was a related goods case. Thus, to prevail on its trademark infringement claims, Chrysler must affirmatively prove that (1) its Jeep grille design is non-functional, (2) the design has obtained secondary meaning, and (3) Vanzant's selling of grille screens and overlays that mimic Chrysler's grille design is likely to confuse the public as to the source of the grille screens and overlays. *See Banana Republic,* 831 F.2d at 1506.

## B. CHRYSLER'S MOTION FOR SUMMARY ADJUDICATION OF THE ISSUE OF ITS GRILLE DESIGN'S NON–FUNCTIONALITY

Chrysler contends that the design for which it has registered a trademark for automobile grilles ("the 760 design") is non-functional when used in the grille cover market.[6] It has accordingly moved for

2. "Related goods" are goods which, though not covered by a trademark registration, "would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner...." *Charles Schwab & Co. v. Hibernia Bank,* 665 F.Supp. 800, 804 (N.D.Cal.1987).

3. The Lanham Act, 15 U.S.C. §§ 1051–1127, provides two statutory causes of action for infringement of a trademark. The first is for infringement of a registered trademark. *See id.* § 1114(1) ("section 1114"). The second is for infringement of an unregistered, common law trademark. *See id.* § 1125(a)(1) ("section 1125"). Infringement of an unregistered, common law trademark is often referred to as "unfair competition" under the Lanham Act. *See, e.g., Kendall–Jackson Winery v. E. & J. Gallo Winery,* 150 F.3d 1042, 1046 & 1047 n. 7 (9th Cir.1998). Chrysler's first count alleges that Vanzant's sale of grille screens and overlays infringes its registered 760 mark and thus states a section 1114 claim. Chrysler's second count alleges that Vanzant's sale of grille screens and overlays constitutes unfair competition under the Lanham Act and thus states a section 1125 claim.

4. A party alleging trademark infringement need not prove that its mark has secondary meaning if the mark is "inherently distinctive." *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992) ("An identifying mark is ... capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning."). Because Chrysler has not argued that its grille design is inherently distinctive, it must prove secondary meaning as part of its prima facie case. *See Blue Bell II,* 778 F.2d at 1354.

5. In this way, a related goods case under section 1114 differs little from a section 1125 claim where the party asserting trademark infringement must always affirmatively prove non-functionality and distinctiveness since there is, by definition, no registration on which to rely.

6. Though grille screens and overlays are different products with somewhat different functions, neither party emphasizes such differences for purposes of either motion. Therefore, the Court, for convenience, will

summary adjudication of this issue, contending that the undisputed facts permit no other conclusion. Vanzant opposes Chrysler's motion, arguing that grille covers designed to protect an automobile's paint are inherently functional, that using the 760 design is the best way to achieve that purpose, and that Chrysler's success in this lawsuit would give it a non-reputation related advantage in the grille cover market for Jeeps.

### 1. Functionality—Generally

■ Distinctive product designs—or distinctive features thereof—can serve as trademarks protectable by the Lanham Act, subject to the doctrine of functionality. Functionality is a judicially-created doctrine which limits those aspects of a product configuration which may be trademarked. As noted recently by the Supreme Court, functionality serves an important public policy purpose:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time . . ., after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

*Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995); *see also Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1530 (Fed.Cir.1994) ("Because trademark protection is potentially perpetual in duration, protection of a functional trademark would

defeat [the] fundamental right [to compete]."). The prohibition against trademarking functional product features and designs is so strong that, even where a business can prove secondary meaning in a product's design—or features thereof—and likelihood of confusion, its trademark claim will fail if it cannot also establish as a threshold matter that the design is non-functional. *See Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 380 (7th Cir.1996).

■ The doctrine of functionality can at times be difficult to define and apply. At heart, the analysis looks to whether the design of the product, or a feature thereof for which trademark protection is independently claimed, constitutes the actual benefit that the consumer wishes to purchase or instead acts as an assurance that a particular entity made, sponsored, or endorsed a product. *See International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir.1980). A number of factors are relevant to the functionality analysis: (1) whether the design yields any utilitarian or aesthetic advantage not related to reputation; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. *See Disc Golf Assoc., Inc. v. Champion Discs. Inc.*, 158 F.3d 1002, 1006 & 1007 (9th Cir.1998). Also relevant is whether the party asserting trademark rights intended the product design, when creating it, to serve as a trademark. *See Vuitton et Fils S.A. v. J. Young Enter., Inc.*, 644 F.2d 769, 773–74 (9th Cir.1981) (finding that element of plaintiffs product design was non-functional in part because plaintiff treated the design element as a trademark from its inception). "No one factor is dispositive; all should be weighed collectively." *Id.* The weighing should be done in light of what effect granting trade-

*refer to the products collectively as grille* "covers."

mark rights in the product design would have on legitimate competition, as "the effect upon competition is really the crux of the matter." *In re Morton–Norwich Prod., Inc.*, 671 F.2d 1332, 1341 (C.C.P.A. 1982) (internal quotation marks omitted). Functionality is a question of fact for which the party asserting trademark rights (i.e., Chrysler) has the burden of persuasion. *See Banana Republic*, 831 F.2d at 1506.[7]

Preliminarily, Vanzant argues that because grilles and grille covers have utilitarian purposes, they are functional as a matter of law. The Court cannot agree. A product can, as a whole, have utilitarian purposes and yet not be functional in the legal sense. The Federal Circuit uses the terms "de facto functionality" and "de jure functionality" to describe the difference:

> In essence, de facto functional means that the design of a product has a function, i.e., a bottle of any design holds fluid. De jure functionality, on the other hand, means that the product is in its particular shape because it works better in this shape. This distinction is useful because the configuration of a product is not necessarily lacking in trademark significance because of the mere existence of utility; rather it should depend on the degree of design utility.

*In re R.M. Smith, Inc.*, 734 F.2d 1482, 1484 (Fed.Cir.1984).

A Coca–Cola bottle is an ideal example. The bottle is utilitarian in that it holds liquid, yet the fluting design on the outside of the bottle is non-functional in that it does not add to the utility of the bottle. *See Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prod.*, 134 F.3d 749, 757 (6th Cir.1998) (Martin, J., dissenting) (discussing Coke bottle). The Coca–Cola company can thus prevent others from making bottles with their distinctive fluting, but it cannot prevent others from making bottles. Similarly, while grilles and grille covers are de facto functional, such de facto functionality does not determine the issue of whether the 760 grille design is de jure functional as used on automobile grilles and/or grille covers.

Moreover, whether or not the grille design is non-functional when used to make automobile grilles is not determinative of whether the design is non-functional when used to make automobile grille *covers*. Ninth Circuit precedent teaches that a product design or feature may be non-functional in one context while its use in other contexts is functional and not infringing. *Job's Daughters* is a case in point. In *Job's Daughters*, the plaintiff was a fraternal organization which had for decades used its name and emblem (three girls within a double triangle holding a dove, an urn, and a cornucopia) as a collective mark. *See Job's Daughters*, 633 F.2d at 914 & n. 1. The plaintiff claimed that the mark as used on jewelry had trademark significance, and thus sued the defendant who was manufacturing and selling jewelry decorated with the mark. The district

---

7. Chrysler argues that its trademark registration for the 760 design affords it a presumption of non-functionality, and shifts the burden to Vanzant to disprove non-functionality. *See* Pl.['s] Mem. in Supp. of Pl.['s] Mot. for Summ.J. of Functionality of the Jeep Grille Mark, at 9 (citing *Playboy Enter., Inc. v. Chen*, 45 U.S.P.Q.2d 1400, 1407 (C.D.Cal.1997)). Chrysler is wrong. The Ninth Circuit's previous memorandum in this case stated that any presumptions accompanying a federal trademark registration are applicable only when the registration holder is suing someone using the mark on goods covered by the registration. Such was the case in *Playboy Enterprises. See* 45 U.S.P.Q.2d at 1402, 1997 WL 829339 (noting that Playboy's Rabbit Head Design was registered for use on a variety of consumer goods, including clothing, hats, patches, and pins, and that defendant was using the design on hats and patches). Here, Chrysler's trademark registration only covers a grille design for land vehicles and thus affords it no presumptions, either of non-functionality or secondary meaning, in an infringement action against someone using a similar design for the manufacture of grille covers. *See Blue Bell II*, 778 F.2d at 1354. Accordingly, Chrysler must affirmatively prove non-functionality in order to prevail on its trademark infringement claims against Vanzant.

court agreed and enjoined defendant's use, but on appeal the Ninth Circuit reversed.

The Ninth Circuit found that while the mark might serve trademark purposes in some contexts, in the context of the facts presented, the mark was not being used to convey to the public that the rings were sold or endorsed by plaintiff's fraternal organization. *See id.* at 918. Instead, the mark as used on jewelry had independent, "functional" significance in that it allowed the purchasers of the jewelry to express their affinity with plaintiff's fraternal organization. *See id.* (rejecting proposition that a "purely functional use of a trademark violates the Lanham Act"). The court held that plaintiff did not have any legal right to prohibit others from capitalizing on that consumer desire in a situation where the consumers were not confused as to plaintiff's involvement in the manufacture of the jewelry. *See id.* at 919 ("A trademark owner has a property right only insofar as is necessary to prevent consumer confusion as to who produced the goods and to facilitate differentiation of the trademark owner's goods.").

To similar effect is *Plasticolor Molded Prod. v. Ford Motor Co.*, 713 F.Supp. 1329 (C.D.Cal.1989) (Kozinski, J.).[8] In *Plasticolor*, plaintiff sought a declaratory judgment that its use of the Ford trademark on the after-market floor mats that it sold for use with Ford vehicles was non-infringing in that the use was a functional one. The plaintiff reasoned that owners of Ford vehicles would want floor mats that blended aesthetically with the interior of their vehicles and that including the Ford moniker would appease that desire, a proposition that the court found at least partly convincing:

On one hand, a purchaser [of the floor mats] could reasonably interpret the marks as source-identifiers, as indicating that Ford has either manufactured or authorized production of the mats. On the other hand, a purchaser could reasonably consider the marks to be functional elements, designed to help the mats contribute to a harmonious ensemble of accessories and decorate the interior of a car. Indeed, a reasonable purchaser could easily interpret the marks both ways simultaneously.

*Id.* at 1335; *cf. University of Pittsburgh v. Champion Prod., Inc.*, 566 F.Supp. 711, 720–21 (W.D.Pa.1983) (finding that university could not prevent clothes' manufacturer from using its logo on clothes in an aesthetically functional way that did not imply the university's association with the goods' sale or manufacture). As another court has said:

[M]arks that are exploited only for their functional value and not to confuse the public receive no protection under unfair competition laws. Functionality in this context means that consumers desire the mark for its intrinsic value and not as a designation of origin. When a mark without copyright protection is exploited for its intrinsic functional value, Congress has implicitly determined that society's interest in free competition overrides the owner's interest in reaping monopoly awards.

*Bi–Rite Enter., Inc. v. Button Master*, 555 F.Supp. 1188, 1195 (S.D.N.Y.1983).

Thus functionality must be assessed within the context in which the product design is being used. In the present facts, the context is a limited one. Because there is no evidence that Vanzant's grille covers could or have been used on vehicles other than Jeeps, the functionality of the grille design must be assessed in the context of the grille cover market for Jeeps. The relevant question becomes what do consumers of grille covers for Jeeps expect from such a product, and are there a sufficient number of ways to satisfy that need

8. The Court realizes that the Plasticolor opinion has been vacated by consent of the parties. *See Plasticolor Molded Prod., Inc. v. Ford Motor Co.*, 767 F.Supp. 1036 (C.D.Cal. 1991). The Court thus refers to the case only to illustrate how the use of a trademark can be source-identifying in one context and yet functional in another context.

without using the grille design which Chrysler uses as a trademark to differentiate its Jeep vehicles from other automobiles.

### 2. Chrysler Has Not Submitted Sufficient Evidence of Non–Functionality To Warrant Summary Adjudication of this Issue in Its Favor.

Neither party has directly presented evidence concerning the function of a grille cover or concerning consumer expectations for grille covers that can be used on a Jeep.[9] Chrysler has submitted uncontested evidence that there are at least two other ways to build grille screens for Jeeps.[10] The Court finds that such evidence, as a matter of law, is insufficient to establish the non-functionality of the grille design when used to make grille covers.

 For a design to be non-functional, there must *at least* be a sufficient number of alternative designs such that granting trademark rights over one of them will not hinder competition. *See Disc Golf,* 158 F.3d. at 1008 (citing J.T. McCarthy, McCarthy on Trademarks and Unfair Competition § 7:75, at 7–156 (4th ed.1998)); *Keene Corp. v. Paraflex Indus., Inc.,* 653 F.2d 822, 827 (3d Cir.1981) ("[M]erely because there are other shapes and design which defendant could use and still produce a workable product, the design used is not thereby non-functional."). These alternative designs must be "more than merely theoretical or speculative;" they must exist and be "commercially feas-

ible." *Disc Golf,* 158 F.3d at 1008 (citing *Sega Enter. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1531 (9th Cir.1992)). Three alternative designs clearly is not a sufficient number to justify Chrysler's monopolizing one through trademark. *See, e.g., Keene,* 653 F.2d at 827 (noting that 12–15 alternative designs could be insufficient); *In re Lincoln Diagnostics Inc.,* 30 U.S.P.Q.2d 1817, 1824–25, 1994 WL 262247 (T.T.A.B.1994) (finding that, even if there were seven alternative designs for a product, allowing applicant to monopolize one through trademark would impermissibly hinder competition). Accordingly, Chrysler's motion for summary adjudication will be denied.

### C. VANZANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS I AND II AND A PORTION OF COUNT III OF THE COMPLAINT ON THE ISSUE OF SECONDARY MEANING

Vanzant contends that he is entitled to summary judgment on Counts I and II and a portion of Count III of Chrysler's complaint. According to Vanzant, Chrysler has not produced significant, probative evidence that its grille design had achieved secondary meaning "with respect to Defendant's grille overlay's [sic]" by January 15, 1990, the date at least by which Vanzant began selling his grille covers. Chrysler submits evidence which it argues demonstrates that the 760 mark had secondary

---

9. Both parties spend a large portion of their briefs debating whether Chrysler's design is functional as used on automobiles. Much of the evidence Chrysler submits with its motion is likewise dedicated to this issue, including the Expert Report of Frederick E. Hoadley and the Declaration of John Sgalia. This issue is, however, largely irrelevant to the issue of whether the grille design is nonfunctional when used to manufacture grille covers. For even if the design were nonfunctional as used on utility vehicles, this conclusion would not dictate that the same design is non-functional when used to make grille covers that fit Jeeps. This is because, while uncontroverted evidence discloses that

there are many ways that automobile manufacturers can design a grille for their utility vehicles without using the 760 design, there are only a few ways that one can design a grille cover that can be used on Chrysler's Jeeps.

10. The first is a black "bra" grille cover which would mask the whole front end of the Jeep vehicle. The second is a screen which is attached on the outside of the Jeep vehicle, over the grille, and between the headlights. When attached, the screen covers both the slats and the openings between the slats.

meaning in the grille cover market prior to January 15, 1990.

### 1. Secondary Meaning—Generally

██ "Unlike a statutory copyright or a patent for an invention, a trade-mark confers no right in gross or at large." *Treager v. Gordon–Allen,* 71 F.2d 766, 768 (9th Cir.1934) (citing *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918)); *accord Anheuser–Busch, Inc. v. Balducci Publications,* 28 F.3d 769, 777 (8th Cir. 1994). Instead a mark is protectable only as to those goods or services for which its user has established in the minds of the public an association between it and the mark. This association is called "secondary meaning." *See Blue Bell II,* 778 F.2d at 1354. Whereas the functionality analysis tests whether a product design can serve a trademark purpose, the secondary meaning analysis tests whether the individual claiming trademark rights has succeeded in educating the public of the design's trademark purpose. *See Carter–Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794, 802 (9th Cir.1970) ("The test of secondary meaning is the effectiveness of the effort to create it, and the chief inquiry is directed towards the consumer's attitude about the mark in question. . . .").

██ Mere "association" is not sufficient to establish secondary meaning. Instead a specific type of association must be proven. This kind of association is demonstrated where individuals viewing the design over which trademark rights are asserted associate that design *with a single source,* whether or not they can name that source. *See Blue Bell II,* 778 F.2d at 1354. In the case of a product configuration which is not inherently distinctive and which has utilitarian as well as trademark purposes, the public must be cognizant of the design's trademark purpose in order for the design to be protectable. *See In-*

*wood Lab., Inc. v. Ives Lab. Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982) ("To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature . . . is to identify [a single] source of the product rather than the product itself.") (emphasis added); *accord First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir.1987). As the Seventh Circuit has noted:

> [In a product configuration case, it] is not enough that the consumers associate the form of the product with a particular producer. Such an association is inevitable when the first comer [has been the exclusive producer]. Consumers must also care that the product comes from a particular producer (though they need not be able to identify him) and must desire the product with the particular feature because it signifies the producer.

*Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 659 (7th Cir.1995).

Thus, in this case, Chrysler must demonstrate that a requisite number of individuals presented with grille covers that mimic the 760 mark think that the grille cover is made by, or associated with, the same entity who owns and uses the 760 mark. More specifically, individuals presented with the grille covers must respond, "Jeep/Chrysler makes these" or "Jeep/Chrysler must be involved somehow in the sale of these grille covers."[11] "This grille cover would fit [or go with] a Jeep" would not suffice to establish secondary meaning in that such a response focuses on the functional aspects of the grille cover instead of the source-identifying nature of the design.

██ Secondary meaning does not happen by accident. Instead, it requires affirmative and deliberate actions by the person seeking to establish legal rights in the

---

**11.** Although under traditional secondary meaning analysis, the single source need not be known, Chrysler's theory is that consumers associate the 760 mark with it and not with some anonymous producer.

mark, especially when the mark is a product configuration or some aspect thereof. *See, e.g., First Brands*, 809 F.2d at 1383 (finding that advertisements featuring a product as a whole do not necessarily produce secondary meaning in a non-functional element of the product's configuration when the advertisement does not focus on the non-functional element); *Textron, Inc. v. United States Int'l Trade Comm'n*, 753 F.2d 1019, 1025 (Fed.Cir.1985) (same); *San Francisco Mercantile Co. v. Beeba's Creations, Inc.*, 704 F.Supp. 1005 (C.D.Cal. 1988) (same).[12]

■ A person asserting trademark infringement against another must prove as a factual matter that it had established secondary meaning in the mark (1) as to the particular line of goods in question (2) prior to the date that the alleged infringer began using the mark. *See Blue Bell II*, 778 F.2d at 1357–58; *HMH Publ'g Co. v. Brincat*, 504 F.2d 713, 715 & 719 (9th Cir.1974). Where the party asserting trademark rights in a product design fails to set forth sufficient evidence from which a trier-of-fact could reasonably conclude the establishment of secondary meaning in the relevant market as of the relevant time, summary judgment for the adverse party is appropriate. *See Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 912 (9th Cir. 1995) (affirming district court's entry of summary judgment against trademark plaintiff based upon plaintiff's failure to establish secondary meaning); *San Francisco Mercantile*, 704 F.Supp. at 1010

(granting summary judgment to trademark defendant where plaintiff could not establish secondary meaning); *cf. Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 169 (2d Cir.1991) (noting that "proof of secondary meaning entails vigorous evidentiary requirements") (emphasis added).

## 2. Proving Secondary Meaning in a Related Goods Case

A triumvirate of cases involving jeans and other apparel manufactured and sold by Levi Strauss & Co. ("Strauss") illustrates the limited right afforded in a trademark and the affirmative showing that the owner of a registered trademark must make as to secondary meaning when asserting that a registered trademark has been infringed by a "related good." Strauss has for many decades manufactured jeans. In 1936, a Strauss employee came up with the idea of including on the right, rear, "patch" pocket of these jeans a folded ribbon ("the tab") sewn into the left-hand vertical seam of the pocket. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 818 (9th Cir.1980) (*"Blue Bell I "*). From its inception, the tab was to serve as a trademark, and through the years Strauss applied for and received several registered trademarks which recognized the secondary meaning that Strauss had developed in it. *See id.* n. 1.

Prior to 1970, Strauss's registered trademark rights in the tab only extended to certain colored tabs affixed in the left-

12. The *First Brands* court called this "image advertising," insofar as the ads focus in some way on the protectable (i.e., non-functional) aspects of the trade dress itself. 809 F.2d at 1383. In *First Brands*, Prestone asserted that it had trademark rights in a yellow anti-freeze jug. The court found that while the jug itself was functional, the application of yellow to the jug might be non-functional. *Id.* at 1383–84; *cf. In re Owens–Corning Fiberglas Corp.*, 774 F.2d 1116 (Fed.Cir.1985) (holding that pink as used on fiberglass insulation was non-functional). *But see Deere & Co. v. Farmhand, Inc.*, 560 F.Supp. 85, 98 (S.D.Iowa 1982) (holding that green was functional for farm

equipment since many farmers desire their equipment to match), *aff'd*, 721 F.2d 253 (8th Cir.1983). However, in affirming the district court's conclusion that Prestone had not established secondary meaning in yellow as applied to antifreeze jugs, the court noted that even though Prestone had been the exclusive user of yellow on anti-freeze jugs for five years and had advertised its product widely, the advertisements did not focus the consumers eyes affirmatively on the yellow. The advertisements did not, "for example, urge consumers to look for the 'familiar yellow jug.' " *Id.* at 1383.

hand vertical seam of a right, rear, patch pocket of jeans. *See id.* at 818 n. 1 & 819 ("[T]he tab trademark should be, and is limited to a right-rear patch pocket."). However, beginning in the 1970s, Strauss attempted to assert its locationally-limited trademark rights in the tab against other clothes manufacturers who were using similar tabs on their jeans, shoes, and shirts. At first it succeeded. For example, in *Blue Bell I*, the Ninth Circuit affirmed the district court's finding that Blue Bell's use of a tab sewn into the *bottom, horizontal* seam of the right, rear pocket of a pair of jeans infringed Strauss's trademarks. In affirming, however, the Ninth Circuit reminded the parties that a trademark is not a right in gross: "The parties have argued toward general definitions of Strauss's trademark rights under various hypothetical circumstances. Such definitions must await presentation of an actual case or controversy involving established facts." *Id.* at 822 n. 7.

Such cases soon presented themselves. In 1984, the Federal Circuit affirmed the Patent and Trademark Office's ("PTO") rejection of Strauss's application for trademark rights in the tab as used on shoes. *See Levi Strauss & Co. v. Genesco, Inc.,* 742 F.2d 1401 (Fed.Cir.1984). Strauss had applied for trademark rights in the tab for use in the sale of shoes, a related good. *See supra* note 2. In an argument similar to Chrysler's in this case, Strauss argued that its long-time use of the tab as a trademark for jeans, coupled with a one-year use of the tab on shoes, entitled it to a presumption of secondary meaning in the tab in regards to shoes. *See id.* at 1402. The PTO rejected this argument, but ultimately allowed Strauss's application to proceed, at which point Genesco, Inc. intervened in opposition to the application. Genesco moved for summary judgment against Strauss's application before the PTO Trademark Trial and Appeal Board ("Board"), arguing that widespread use of similar tabs on shoes precluded Strauss from acquiring trademark rights in the tab

for use on shoes. The Board agreed, and entered summary judgment against Strauss's application.

Strauss appealed, arguing that its widespread use of the tab on jeans raised a genuine issue of fact as to whether it had established secondary meaning in the tab as related to shoes. The Federal Circuit disagreed, however, finding that, "The strength of the tab as a trademark for pants *might* be relevant *if* there were evidence establishing public awareness and transference of its trademark function to related goods [i.e., shoes]. There is no such evidence and [*Strauss's* ] *mere assertion of a possibility of such transference does not raise a genuine issue of material fact."* *Id.* at 1405 (emphasis added).

The Ninth Circuit soon thereafter addressed a similar situation in *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352 (9th Cir.1985) (en banc) ("*Blue Bell II* "). In *Blue Bell II,* Strauss argued that Blue Bell's manufacture of shirts with a tab sewn into the shirt pocket's seam infringed its registered trademark in the tab for jeans. After a bench trial the district court found that Strauss had not established secondary meaning in the tab with regard to the market for shirts and that, even if it had, Strauss failed to show that there was a likelihood of confusion. Strauss appealed, and the Ninth Circuit, sitting en banc, affirmed.

On appeal, Strauss first argued that *Blue Bell I,* in which Strauss established the strength of the tab as a trademark for jeans, precluded Blue Bell from contesting the strength of the mark in general. The Ninth Circuit strenuously disagreed: "Secondary meaning in the pant tab does not necessarily inhere in the shirt tab since the pant tab was registered as a location specific mark.... *Blue Bell I* [is not] an appropriate basis for collateral estoppel in any area other than the pants market."

Strauss then argued that even in the absence of a presumption of secondary meaning (from *Blue Bell I* or its registra-

tion of the tab for pants), it had proven secondary meaning in the tab in regard to the shirt market. In making this argument, Strauss contended that the district court erred in disregarding the secondary meaning that Strauss had established, through registration and litigation (i.e., *Blue Bell I* ) in the tab for pants. The Ninth Circuit disagreed. It concluded instead that, while "the strength of the tab as a trademark for pants is not irrelevant to the issue of secondary meaning in the shirt market *where evidence exists of public awareness and transference of its trademark function to shirts,*" *id.* at 1357 (emphasis added) (citing *Genesco, supra,* 742 F.2d at 1405), the district court did not err in concluding that evidence submitted by Blue Bell outweighed any transference of secondary meaning that Strauss might have demonstrated between the pants and shirt markets. The court then concluded that without proving secondary meaning, Strauss could not establish likelihood of confusion since, without a protectable trademark interest in the tab in regard to the market for shirts, there could be no infringement. *See id.* at 1359.

The facts of this case are closely analogous to those in *Blue Bell II.* Chrysler has a registered trademark in an automobile grille design (i.e., the 760 mark). Chrysler claims that Vanzant's sale of grille covers which mimic the 760 mark infringes the registered 760 mark. Grille covers are "related goods" to automobile grilles, similar to shirts' being "related goods" to jeans in *Blue Bell II.* They are indeed closely related, but so too were shirts. In fact, the dissenting en banc judges in *Blue Bell II* felt that the close relationship between jeans and shirts warranted a less strict analysis of secondary meaning, especially in light of *Blue Bell I,* where the issue of secondary meaning was litigated between the very parties before the court in *Blue Bell II:*

> In [*Blue Bell I* ], we protected Strauss' pant pocket tab against Blue Bell's infringement in the casual pants market.

Here, Strauss seeks relief when Blue Bell places the identical tab on casual shirts. Casual pants and casual shirts are "related goods"—they are complementary items, sold through the same channels of trade, used by the same purchasers, and sold within the same price range. There could be no clearer case for application of the related goods doctrine.

*Blue Bell II,* 778 F.2d at 1362 (Nelson, J., dissenting).

The dissent focused on the Ninth Circuit's conclusion in *Blue Bell I* that " '[t]he evidence of secondary meaning is strong and the Strauss mark is entitled to *a broad scope of protection.*' " *Id.* at 1363 (emphasis added in *Blue Bell II* ) (quoting *Blue Bell I,* 632 F.2d at 821). The dissent felt that, because of this, Strauss should be able to apply the secondary meaning established in *Blue Bell I* to the shirt market at issue in *Blue Bell II:* "[U]nder the related goods doctrine, the issue of secondary meaning of the pant tab is a part of this action.... [T]he Strauss pant pocket tab has secondary meaning which should have been considered by the district court in considering the related goods claim of the infringement of Strauss' pant tab trademark [by Blue Bell's shirts employing a similar tab]." *Id.* at 1363–64.

The en banc majority in *Blue Bell II* disagreed. Its conclusion to the contrary means that despite the close relationship between automobile grilles and grille covers, in order to defeat Vanzant's motion for summary judgment, Chrysler must produce significant probative evidence that the 760 grille design had secondary meaning in the grille cover market prior to Vanzant's entry into that market. *See id.* at 1354 & 1358. Admissible evidence, not contradicted by Chrysler, establishes that date as no later than January 15, 1990.

Factors relevant to whether Chrysler had established the requisite secondary meaning in the grille cover design prior to January 15, 1990 include: (1) whether actual purchasers of the grille covers shaped

like the 760 mark associated the 760 design, when used on grille covers, with Chrysler; (2) the degree and manner of advertising that Chrysler undertook in the grille cover market featuring the 760 design; (3) the length and manner of use of the 760 design in the grille cover market; and (4) whether Chrysler's use of the 760 design in the grille cover market was exclusive. *See id.* at 1358. Additionally, when properly conducted and directed toward the relevant issues, "an expert survey of purchasers can provide the most persuasive evidence on secondary meaning." *Id.* If Chrysler has not presented significant probative evidence that its grille design had secondary meaning in the grille cover market prior to January 15, 1990, Vanzant will be entitled to summary judgment on Counts I and II and a portion of Count III of Chrysler's complaint since secondary meaning is a necessary element of these claims. *See id.* at 1359.

### 3. Chrysler's "Evidence" of Secondary Meaning

In its opposition to Vanzant's motion, Chrysler has submitted five items of evidence that it argues establish that its 760 mark had acquired secondary meaning in the grille cover market prior to January 15, 1990. The first two are the registrations for the trademarks that Chrysler owns in the Jeep grille designs as used on "land vehicles" (i.e., the 760 and 088 marks). The third contains the results of a recently-conducted survey that tested consumers recognition of the 760 and 088 marks and the opinions of an expert who analyzed the results and expressed opinions regarding the import of the results. The fourth is a declaration from a 31–year employee of Chrysler who attests to certain "facts" concerning the history and marketing of the 760 mark. The fifth is an excerpt from a 1993 deposition of Vanzant in which he acknowledges molding his grille screens and overlays from one of Chrysler's grilles employing the 760 mark.

### a. Chrysler's Trademark Registrations

Chrysler submits the trademark registrations for two grille designs, its 760 and 880 marks, as evidence that the 760 grille design had achieved secondary meaning in the grille cover market prior to January 15, 1990. Chrysler applied for both of these trademark registrations prior to 1990, although the incontestability of the 760 mark was not recognized until 1992.

*Blue Bell II* teaches without equivocation that Chrysler must establish that the mark in question had achieved secondary meaning *in the relevant market* (i.e., the grille cover market) prior to Vanzant's first use of the mark. It is not sufficient to demonstrate that the grille design had secondary meaning in the automobile market, even though that market is related to the grille cover market.

Chrysler's trademark registrations afford it a presumption of secondary meaning in the grille designs in the automobile market. Although the strength of the grille design as a trademark in the automobile market may be evidence relevant to the issue of secondary meaning in the grille cover market, *see id.* at 1357, its relevance depends on Chrysler's first submitting additional evidence that demonstrates public awareness and transference of the grille designs' trademark function to grille covers. *See id.* (citing *Genesco,* 742 F.2d at 1405). The mere assertion that there is a possibility of such transference does not raise a genuine issue of material fact on the issue of secondary meaning. *See Genesco,* 742 F.2d at 1405.

Chrysler has submitted no evidence which demonstrates that, prior to 1990, there was any public awareness in, or transference to, the grille cover market of the trademark function that its 760 and 088 designs had in the automobile market. Because the mere assertion of such a possibility does not create a genuine issue of material fact, *see id.,* the submission of these registrations is not significant probative evidence.

### b. Chrysler's Secondary Meaning Survey

To similar effect is the survey evidence submitted by Chrysler. The survey was conducted for Chrysler between July 23 and September 18, 1998. Specially-selected individuals [13] interviewed for the survey were shown cards containing either an illustration of the 760 grille design, the 088 grille design, or the grille design for a Geo Tracker, a competing utility vehicle. The individuals were then asked three questions: 1) "Now with regard to small sport utility vehicles, do you associate the appearance of this[, pointing to illustration on card,] with any particular vehicle or vehicles?" 2) "With what vehicle or vehicles?" 3) "Do you associate the appearance of this[, pointing to illustration on card,] with one vehicle or more than one vehicle?"

The interviewers recorded the interviewees' verbatim responses and then the results were categorized and tabulated. The report submitted as evidence for purposes of the present summary judgment includes the verbatim responses of the interviewees to questions 1 and 2, *but not to question 3.* Of the 102 interviewees who were shown the 088 grille design, 77 percent "associated" it with Chrysler/Jeep/Wrangler. Of the 94 interviewees who were shown the 760 grille design, 71 percent "associated" it Chrysler/Jeep/Wrangler. And of the 108 interviewees who were shown the Geo Tracker grille design, 6.5 percent "associated" it with Chevrolet/Geo/Tracker, whereas 12 percent "associated" it with Chrysler/Jeep/Wrangler.

Based on these responses, Chrysler's expert, Gerald L. Ford, concludes in a report accompanying the survey data that, "Even with an adjustment for 'noise' in the survey data, these data evidence that the '088 and the '760 designs have achieved significant acquired distinctiveness and, as a result, are strong marks." He also concludes that, "[T]he '088 and '760 designs had achieved trademark significance or secondary meaning, prior to 1990. Specifically, the survey results, when reviewed in light of: (1) the length of use; (2) the quantity of sales; (3) the quantity of advertising and promotion; and (4) other factors (i.e., publicity, post-sale exposure, etc.) support a finding of acquisition of secondary meaning for the '088 and '760 designs prior to 1990."

Though the results of the survey seem striking upon initial examination, a close reading of the report's contents and the conclusions of Chrysler's expert reveal that the survey results do little that the 760 and 088 registrations do not do by themselves. The survey results merely confirm that the grille designs covered by the 760 and 088 registrations have secondary meaning *in the small sport utility vehicle buying market.*[14] But the registrations of the two marks establish, or at least require the Court to presume, such secondary meaning. The survey results do nothing to establish that the grille designs covered by the 760 and 088 registrations serve a trademark purpose *in the grille*

---

13. The selection criteria used for the survey narrowed the survey universe to individuals between the ages of 18 and 49 who were likely to purchase or lease, within the next two years, a new or used small sport utility vehicle like ones listed on a piece of paper shown to them. (The following vehicles were listed: "Chevrolet/Geo Tracker, Honda CR–V, Isuzu Amigo, Jeep Wrangler, Suzuki Sidekick/Sport/X–90, Toyota RAV4, etc.") Some who met these criteria were excluded from the survey universe if they did not have their glasses with them, worked for an advertising firm or motor vehicle manufacturer, had participated in a consumer survey poll within the

past three months, or had overheard anything concerning the nature of the survey.

14. Actually, it is not at all clear that the survey even does that. This is because Chrysler conspicuously omitted the verbatim responses for question 3, which asked interviewees whether they associated the design shown to them "with one vehicle or more than one vehicle." Without the answers to this question, which goes to the heart of the matter (i.e., whether the interviewees associated the mark with a single source), it is unclear in what way the interviewees "associated" the mark with Chrysler.

*cover market,* let alone whether they did, or could have done, so prior to 1990.

This is particularly odd in light of the history of this case. When the Ninth Circuit reversed the previous grant of summary judgment to Chrysler, it concluded that this was a related goods case in which Chrysler had to prove secondary meaning instead of relying upon the presumptions afforded to it by its trademark registrations. But in doing so, the court did not say that Chrysler had to re-prove what it had already established in acquiring its registrations from the PTO (i.e., that the 760 and 088 designs serve a trademark purpose *in the utility vehicle market*). This would make little sense. Instead, the court reversed because Chrysler had not presented any evidence that the 760 and 088 designs serve a trademark purpose *in the grill cover market,* a market for which Chrysler's registrations carry with them no statutory presumptions. Chrysler's survey, in which the survey universe was potential purchasers of utility vehicles as opposed to potential purchasers of grille covers for Jeeps suffers the same judgment by this Court—it is not significantly probative on the issue of whether the 760 design had acquired secondary meaning in the grille cover market as of January 15, 1990.

The conclusions of Chrysler's expert suffer from the same deficiency in that they do not identify the relevant market or markets for which he expresses his conclusion that "the '088 and '760 designs have achieved significant acquired distinctiveness." In fact, the expert's report submitted for purposes of this motion does not in any way indicate that he took into account the implications of this being a related-goods case. There is, for example, no mention in the report of "grille covers," let alone the "market for grille covers."

At most, the report establishes that Chrysler has established a *high* level of secondary meaning in the 760 and 088 grille designs in the utility vehicle market as of 1998. *But see supra* note 14. This evidence is not irrelevant to the analysis of whether Chrysler had established secondary meaning for its designs in the grille cover market prior to January 15, 1990, but it becomes relevant only upon a showing of public awareness and transference of the grille's trademark function to grille covers prior to 1990. *See Blue Bell II,* 778 F.2d at 1357; *Genesco,* 742 F.2d at 1405. The survey and expert witness report are not significant probative evidence demonstrating that, prior to 1990, there was any public awareness in, or transference to, the grille cover market of the trademark function that its 760 and 088 designs had in the automobile market. To repeat, the mere assertion of such a possibility does not create a genuine issue of material fact. *See Genesco,* 742 F.2d at 1405.

### c. The Dinger Declaration

Chrysler also submits a declaration from Michael F. Dinger ("Dinger"), one of its employees, as evidence supporting its opposition to Vanzant's motion for summary judgment. Dinger has been an employee of Chrysler for 31 years and has been responsible for marketing products sold by Chrysler, including ones employing the 760 mark. He states that (1) Chrysler has sold tens of thousands of *vehicles* employing the 760 mark before and after January 15, 1990; (2) since 1986, Chrysler has spent millions of dollars advertising these *vehicles* in various media; (3) since 1987, Chrysler has sold an unspecified number of grille overlays which are identical in surface configuration to those sold Vanzant; and (4) "Chrysler has entered into numerous Consent Judgments and Agreements relating to its Jeep grille overlays and the enforcement of the 760 mark." [15]

**15.** Dinger also states that, "The JEEP grille design trademark is clearly distinctive as to source, sponsorship, approval, or association with CHRYSLER." Chrysler points to this statement as evidence that *"third parties* have noted that the Jeep brand vehicle grille design serves as an identifier." *See* Pl.['s] Br. in Opp'n to Def.['s] Mot. for Partial Summ.J., at

Dinger lists eight such judgments and/or agreements without specifying when each was consummated or the content of each.

Dinger's declaration has the same weaknesses as the previously-discussed evidence proffered by Chrysler insofar as its being significantly probative on the issue of secondary meaning in the grille cover market. Sales and advertising of Jeep *vehicles* incorporating the 760 mark might support the conclusion that the design has secondary meaning in the utility vehicle market. However, such evidence does not tend to prove that the design has or had secondary meaning in the grille cover market. Nor does the fact that Chrysler sold its own grille overlays which mimic the 760 mark. *See Sassafras Enter., Inc. v. Roshco, Inc.*, 915 F.Supp. 1, 10 n. 15 (N.D.Ill.) (holding that plaintiff's sale of product for ten years, on its own, did not create a triable issue of fact concerning secondary meaning in the product's configuration).

Finally, the existence of consent judgments and/or agreements entered into by Chrysler concerning the 760 mark has insufficient probative value in the absence of the details of such agreements. For example, Dinger characterizes the consent judgments and agreements as "relating to [Chrysler's] JEEP grille overlays *and the enforcement of the [760 mark]*." (Emphasis added). As characterized, such judgments and/or agreements might involve use of the 760 mark in the manufacture of grille covers or they might concern use of the 760 mark in the manufacture of automobile grilles as replacement parts.

If the judgments/agreements concern use of the 760 mark in the manufacture of grille covers, such evidence might support Chrysler's claim that the 760 grille design had acquired secondary meaning in the grille cover market prior to 1990.

*See e.g., Artus Corp. v. Nordic Co.*, 512 F.Supp. 1184, 1189 (W.D.Pa.1981) (finding that *success* in preventing third party use of a mark can help support a finding that a mark has acquired secondary meaning). However, if the judgments/agreements concern use of the 760 mark in the manufacture of automobile grilles as replacement parts, such evidence could only bolster a fact that Chrysler has already established as uncontroverted—i.e., that the 760 mark has secondary meaning in the utility vehicle market. Without details of the judgments and agreements, evidence of their existence and unclear characterizations of their content and effect are not significantly probative.

Moreover, even if the judgments/agreements concern grille covers, Dinger has not indicated the date on which Chrysler entered into these judgments/agreements. If not entered into until 1996, for example, such judgments/agreements would have little evidentiary value on the issue of whether the 760 design had acquired secondary meaning in the grille cover market prior to 1990. The Court concludes that the Dinger declaration lacks significant probative value in respect to the 760 design having obtained secondary meaning in the grille cover market prior to January 15, 1990.

### d. Vanzant's Admission of Copying

The Court now addresses Chrysler's remaining evidence in opposition to Vanzant's motion. It is uncontroverted that Vanzant has acknowledged that he molded his grille cover from one of Chrysler's grilles employing the 760 mark. Chrysler argues that such intentional copying supports its contention that the 760 mark had

6 (emphasis added). The characterization of Dinger's statement as one coming from a "third party" is troubling. The Court cannot imagine what evidence could support the factual assertion by a company that one of its employees is a "third party" who presumably would have a less biased opinion. *Cf. Self-*

*Realization Fellowship Church,* 59 F.3d at 910 (9th Cir.) ("Trademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark.").

secondary meaning in the grille cover market at the time that Vanzant copied it. Indeed, some courts, including the Ninth Circuit and this one, have said that "[p]roof of exact copying, without any opposing proof, can be sufficient to establish a secondary meaning." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir.1985) (emphasis added); *accord Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir.1996); *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir.1960) (applying California law); *In re Patio Indus.*, 220 B.R. 672, 681 (C.D.Cal.1996).[16] At the same time, however, the Ninth Circuit has warned that drawing an inference of secondary meaning from proof of deliberate copying is not appropriate in all circumstances. *See Fuddruckers*, 826 F.2d at 844.

The issue thus becomes whether this case is an appropriate situation in which to draw an inference of secondary meaning from what undisputably was intentional copying by Vanzant. Ninth Circuit cases, as well as cases from other circuits, indicate that it is only "appropriate" to draw an inference of secondary meaning from intentional copying where the circumstances of the case indicate that the copier, in addition to intending to copy, intended to deceive or confuse the public. The Seventh Circuit has said this directly: "Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as plaintiff's." *Thomas & Betts*, 65 F.3d at 663 (reversing district court's entry of preliminary injunction because court erred when it concluded that party had established secondary meaning in its product's configuration, in part, because rival copied the configuration). So have the Second and Eleventh Circuits.

*See Coach Leatherware*, 933 F.2d at 169 (finding that "conscious replication [of another's trade dress] alone does not establish secondary meaning"); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 859-60 (11th Cir.1983) (holding that proof of intentional copying, in the absence of additional evidence of actual deception, does not "eliminate[ ] the need for proof of secondary meaning"). Though stating it less directly, the Ninth Circuit reached the same conclusion in *Fuddruckers* when it rejected Fuddrucker's argument that proof of intentional copying shifted the burden to the copier to disprove secondary meaning:

> Our cases recognize that evidence of deliberate copying is relevant to a determination of secondary meaning. *E.g., Transgo*, 768 F.2d at 1015-16; *cf. Audio Fidelity, Inc. v. High Fidelity Recordings*, 283 F.2d 551, 557-58 (9th Cir. 1960) (applying California law). Indeed, *in appropriate circumstances*, deliberate copying may suffice to support an inference of secondary meaning. *See Transgo*, 768 F.2d at 1016 (dictum) .... Fuddrucker's would have us go further, and hold that evidence of deliberate copying shifts the burden of proof on the issue of secondary meaning. We decline to so hold. *Competitors may intentionally copy product features for a variety of reasons.* They may, for example, choose to copy wholly functional features that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits.

*Id.* at 844-45 (emphasis added).

Thus, the question is *why* did Vanzant copy the grille employing the 760 design when he made his grille cover. If he copied the design to deceive the public about the origin of his grille covers or

---

16. The Court notes that although each of these courts said that intentional copying alone could satisfy a party's burden of proof as to secondary meaning, in every case except perhaps *Audio Fidelity,* which was construing California and not federal law, there was independent evidence of secondary meaning introduced. For this reason, the Ninth Circuit itself later characterized the quoted language from *Transgo* as dictum. *See Fuddruckers,* 826 F.2d at 844.

because he believed the grille design had secondary meaning, then evidence of such motivation could be significantly probative to permit a reasonable trier-of-fact to infer that the design had secondary meaning in the grille cover market at the time Vanzant copied it. However, if the evidence demonstrates that he copied the design because of what he perceived to be some functional quality of the design, then Vanzant's deliberate imitation of the grille design would not be significantly probative to show that the mark had secondary meaning in the grille cover market. *See id.; cf. Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 611 (7th Cir.1986) (Posner, J.) (noting that "the state of mind of the infringer is more relevant" than the mere fact of copying in deciding whether copied trade dress has achieved secondary meaning, since if infringer thinks the trade dress serves a trademark purpose, that is evidence that it does).

Direct evidence of an intent to deceive or confuse is often difficult to obtain, and circumstantial evidence is often ambiguous. *See Blau Plumbing,* 781 F.2d at 611. The easiest case where intent to deceive can be, and often is, inferred from circumstantial evidence is where a traditional trademark or trade name has been copied. *See, e.g., Yost,* 92 F.3d at 817 (defendants, knowing of plaintiff's use of the name "Committee for Idaho's High Desert," began using it themselves); *Transgo,* 768 F.2d at 1016 (defendant, knowing of plaintiff's product entitled the "Shift Kit," marketed one with the same name). In such cases, the term or symbol used on the product, or a range of products, often "adds nothing to the product." *See Foamation, Inc. v. Wedeward Enter., Inc.,* 970 F.Supp. 676, 684 (E.D.Wis.1997). "Therefore, the only reason a competitor would copy a mark would be to pass off his product as that of the original producer." *Id.* at 685.

Courts have similarly inferred secondary meaning from intentional copying in cases where an individual closely copies product packaging of a direct competitor, especially in cases where there is evidence of actual consumer confusion. *See Audio Fidelity,* 283 F.2d at 553 n. 1 & 556–58 (defendant, knowing of plaintiff's record album entitled "Railroad" consisting of the "stereophonic sound of steam engines," released a record with the same content, entitled the same, and with packaging that was strikingly similar); *Patio Indus.,* 220 B.R. at 680 & 678 (defendant, knowing of plaintiff's sales brochure, made and used an almost identical one, confusing at least some customers as to plaintiff's affiliation with defendant); *cf. Transgo,* 768 F.2d at 1015–16 (noting that evidence of actual confusion can bolster inference of secondary meaning).

For policy reasons, however, courts have long been reluctant to infer an intent to deceive, and thus secondary meaning, from the mere act of copying a competitor's product configuration or design. *See Audio Fidelity,* 283 F.2d at 557 ("The difference in the protection against imitation which will be accorded to an article of commerce on the one hand, and to a package in which the article is marketed on the other, [has long been noted]."). As Justice Oliver Wendell Holmes, then chief justice of the Supreme Judicial Court of Massachusetts, has said,

> The label or ornament [attached to a product] is a relatively small and incidental affair, which would not exist at all [on the product of an alleged infringer], or at least would not exist in that shape but for the intent to deceive; whereas the [product] sold is made as it is, partly at least, because of a supposed or established desire for [products] in that form. The defendant has the right to get the benefit of that desire even if created by plaintiff.

*Flagg Mfg. Co. v. Holway,* 178 Mass. 83, 59 N.E. 667, 667 (1901); *see also Fuddruckers,* 826 F.2d at 844–45 (block-quoted, *supra* ).

Thus, in cases where a *product configuration* has been copied, evidence of inten-

tional copying is not enough, on its own, to defeat a motion for summary judgment based on plaintiff's inability to establish secondary meaning. *See Marketing Displays, Inc. v. Traffix Devices, Inc.,* 971 F.Supp. 262, 269 (E.D.Mich.1997) (noting that evidence of intentional copying of a product's configuration might support an inference of secondary meaning "if supported by additional facts"). The party asserting trademark rights in the product configuration must present independent evidence of the copier's intent to deceive or of his belief that the mark had secondary meaning. *See Thomas & Betts,* 65 F.3d at 663.

Chrysler has submitted no evidence from which a trier-of-fact could reasonably conclude that Vanzant copied its grille design with an intent to deceive or confuse customers. In fact, evidence submitted by Chrysler supports the contrary conclusion. For example, Vanzant makes numerous parts that fit Chrysler's Jeeps, in only one of which Chrysler claims ·a trademark interest in. Also, in his advertisements for his grille screens and covers, Vanzant emphasizes utilitarian qualities of the designs.[17]

Moreover, Chrysler's failure to submit any evidence that independently supports its contention that the 760 design had secondary meaning in the grille cover market prior to 1990 results in a further failure to present evidence from which a reasonable trier-of-fact, in the absence of direct evidence, could reasonably infer that Vanzant himself was aware that the grille design served a trademark purpose in the grille cover market prior to his copying it. If Vanzant was not, or could not have been, aware of the design's alleged trademark purpose when he copied it, the fact that he copied it cannot support an inference that the mark had secondary meaning.

## 4. Conclusion

■■■ Rule 56(c) requires this Court to enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. In order to succeed on its claims of trademark infringement against Vanzant, Chrysler must establish that its 760 design had secondary meaning in the grille cover market prior to January 15, 1990. *See Blue Bell II,* 778 F.2d at 1354 & 1358. Chrysler has not, however, presented any evidence from which a trier-of-fact could reasonably find this by inference or directly.

The Court is mindful that "proof" of secondary meaning is often a matter of inference. *Artus,* 512 F.Supp. at 1189; *John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 318 (E.D.Pa.1976), *aff'd in relevant part sub nom. Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 605 (3d Cir. 1978). This is especially true in a case such as this where the ultimate question is consumers' perception of the 760 design in the grille cover market prior to 1990. Such an inference could perhaps be made from evidence demonstrating that Chrysler itself treated its 760 design as a trademark in the grille cover market prior to 1990 and that it sought to educate the public of the design's trademark purpose in the grille cover market. Chrysler, however, has not presented evidence from which a reasonable trier-of-fact could infer such intentions or efforts.

---

**17.** Vanzant's advertisement for "Grill Screens" states: "These seven heavy duty stainless steel screens are designed to adapt snugly in the individual openings of the grill and serve to keep the radiator clean and help prevent overheating. They are installed easily without drilling and holes in the vehicle. The grill screens are snapped into place, and se- cured with a retainer bar." The advertisement for the overlays is to similar effect: "Vacuum formed plastic to fit snug over the front end. It comes in black but can be easily painted to any color you want. Drilling is not required for installation ... All you do is just snap [it] into position. The bra protects the paint of your front grill and looks good too."

Moreover, whether or not Chrysler treated its 760 design as a trademark in the grille cover market prior to 1990 is not the dispositive issue as to secondary meaning for purposes of this motion. The dispositive issue is whether Chrysler *succeeded* in educating the public of the design's trademark significance in the grille cover market prior to 1990. Evidence regarding Chrysler's success in establishing secondary meaning in the 760 design in the utility vehicle market is not irrelevant to this inquiry if Chrysler had submitted evidence of public awareness and transference of the grille's trademark function to the grille cover market. *See Blue Bell II*, 778 F.2d at 1357. But Chrysler has not submitted such evidence, and the mere assertion of a possibility of such transference and/or awareness does not raise a genuine issue of fact precluding summary judgment. *See Genesco*, 742 F.2d at 1405.

Yet assertions are all that Chrysler has put forward to support its contention that it has successfully transferred the trademark function which the 760 design serves in the utility vehicle market into the grille cover market. Accordingly, Vanzant's motion for summary judgment on Counts I and II and a portion of Count III of Chrysler's complaint will be granted.

Although Vanzant has sought summary judgment without specifying in his amended notice of motion the particular counts in Chrysler's complaint to which it is directed, the effect of the Court's ruling is to grant summary judgment in favor of Vanzant on Counts I and II of the complaint and that aspect of Count III which alleges infringement of a common law trademark under California law (i.e., state unfair competition) since these claims require Chrysler to prove secondary meaning. *See Blue Bell II*, 778 F.2d at 1362 (state unfair competition claim requires proof of secondary meaning). The Court does not, however, reach any conclusion concerning that aspect of Count III which states a state law trademark dilution claim, since such a claim requires a different proof of second-ary meaning. *See Blue Bell II*, 778 F.2d at 1362.

## IV.

## DISPOSITION

IT IS ORDERED THAT:

1) Chrysler's motion for summary adjudication of the issue of its grille design's non-functionality is DENIED.

2) Vanzant's motion for summary judgment on Counts I and II of Chrysler's complaint is GRANTED.

3) Vanzant's motion for summary judgment on that portion of Count III of Chrysler's complaint which states a claim for unfair competition under state law is GRANTED.